```
        IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

UNITED STATES OF AMERICA          :          CRIMINAL ACTION
                                  :
          v.                      :
                                  :
ZHENYU WANG                       :          NO. 20-254-2-4
DANIEL RAY LANE                   :

MEMORANDUM

Bartle, J.                                         April 17, 2024

Before the court are the motion of defendant Zhenyu
Wang for judgment of acquittal, new trial, and arrest of
judgment under Rules 29(c), 33, and 34 of the Federal Rules of
Criminal Procedure (Doc. # 477) and the motion and supplemental
motion of defendant Daniel Ray Lane for acquittal and new trial
under Rules 29(c) and 33 (Docs. # 476, 533).

I

On or about August 25, 2020, a grand jury indicted
Wang, Lane, and their co-defendants for conspiracy under 18
U.S.C. § 371 to violate the International Emergency Economic
Powers Act ("IEEPA"), 50 U.S.C. § 1701, et seq., engaging and
attempting to engage in transactions prohibited by IEEPA, and
conspiring to commit money laundering in violation of 18 U.S.C.
§ 1956(h).  These two defendants were convicted by a jury on all
counts.  The evidence is now viewed in the light most favorable
to the Government as the verdict winner.  United States v.
Wolfe, 245 F.3d 257, 261 (3d Cir. 2001).

The events in this case involved a sting operation.[1] The defendants, along with Nicholas Hovan, Robert Thwaites, and Nicholas Fuchs, participated in what they thought was a transaction to purchase oil from the Islamic Republic of Iran without a license, mask its origins, evade the economic sanctions imposed by the United States against Iran, and sell the oil to a purchaser in the People's Republic of China.[2]  Hovan was introduced to this sting through a confidential informant, Hal Mason, who represented he had connections with Iranian oil suppliers.  Despite characterizations by Mason and various undercover FBI agents, there was never any sanctioned oil for the defendants to purchase.  The numerous relevant conversations between the defendants and Mason or undercover FBI agents were recorded.

The relevant events began when Hal Mason, the confidential FBI informant, approached Hovan and Jason Mumper, an unindicted co-conspirator, with the opportunity to purchase or deal in sanctioned Iranian oil.  He met with them in New

---

1.   A "sting" is an "undercover operation in which law-enforcement agents pose as criminals to catch actual criminals engaging in illegal acts."  Sting, Black's Law Dictionary (11th ed. 2019).

2.   Hovan pleaded guilty to a separate information, while Fuchs and Thwaites, who were indicted in this case along with Wang and Lane, pleaded guilty before trial.  Fuchs and Thwaites testified at the trial as Government witnesses.

York, where Hovan and Mumper expressed interest in introducing Mason to potential buyers for the sanctioned oil.  To discuss the matter in greater detail, the three met at a restaurant in Philadelphia on July 31, 2019.  At that meeting, Hovan and Mumper stated that they did not have the capital for this venture and would need to find funding elsewhere.  They agreed to reach out to potential purchasers in Dallas, Texas, who they believed would be able to identify purchasers.  During the meeting, Hovan called Fuchs, whose brother was an acquaintance of Hovan's brother, to inquire about his interest.  Fuchs worked at Stack Royalties, Inc., a company in the business of selling mineral rights in Texas and Oklahoma.

Upon hearing about the scheme involving sanctioned Iranian oil, Fuchs expressed interest and promptly reached out to his co-worker, Thwaites, and his boss, Lane, who owned Stack Royalties.  Thwaites in turn reached out to Wang, an acquaintance, to participate as well.  Wang is a Chinese citizen and lawful permanent resident of the United States.

Shortly after his meeting with Hovan and Mumper, Mason called Fuchs, Thwaites, and Wang.  Mason told them that the sanctioned oil was only available due to his close, personal connections with Iranian oil suppliers.  They understood the scheme to be lucrative because they would be able to purchase the oil at lower prices due to the sanctions and then sell to

-3-

another country for a significant profit.  During the call, Wang
was eager to participate.  He touted his experience in the oil
business, professed that he was familiar with Iranian crude oil
and that he "loves sanctions, . . . and [that] the sanctions
make everybody money[.]"

        In or about September 2019, Mason flew to Dallas for a
set of meetings related to this scheme.  He was accompanied by
an undercover FBI agent known to the defendants as Ravi Shah.
All of these meetings were recorded.  First, the two met with
Fuchs to discuss financing.  Because Fuchs himself did not have
sufficient capital to contribute, Shah suggested that substitute
assets may be utilized.  Fuchs proposed mineral rights.

        Thereafter, Mason and Shah met with Wang and Thwaites.
During that meeting, they discussed in detail a variety of
issues relating to the venture.  They talked about the
complexities of a ship-to-ship transfer of oil, how such a
transfer could be funded, and how to disguise the oil's origin.
They even settled on the size of the initial shipment: 500,000
barrels of oil.  The group contemplated that they could make
additional shipments of one to two million barrels per trip over
a year or more.  Mason and Shah repeatedly emphasized to Fuchs,
Thwaites, and Wang that they could walk away from the deal at
any time.

After the conversations with Thwaites and Wang, Mason, Shah, and Fuchs met with Lane, who, as noted, was the owner of Stack Royalties and Fuchs' boss.  Lane was relaxed and even joked that nobody should be recording the conversation.  These four discussed the possibility that Lane would solicit Panamanian purchasers for the Iranian oil.  While Lane expressed concern about Iranian sanctions, he said sanctions "can always be massaged.  There's always, you know, a way around it."  Shah then initiated the discussion as to how they would launder the profits of the Iranian oil deal.  Lane recommended mineral rights as a vehicle through which the profits could be laundered.  Mason and Shah stated that Lane and Fuchs would be free to walk away from the deal at any time and did not pressure them.  The following day, September 20, 2019, Fuchs called Mason to let him know that Lane was not interested in putting up mineral rights as collateral.  On November 1, 2019, Lane let Shah know, via Fuchs, that his Panamanian buyers were not interested in purchasing the Iranian oil.

Throughout the interactions in the summer and fall, there was no pressure on Fuchs, Thwaites, Wang, or Lane to participate in the scheme.  All had been told that they could pull out at any time.  Thwaites, Wang, and Fuchs continued to finalize plans over WhatsApp for the purchase and sale of sanctioned Iranian oil.  Wang, who was tasked with finding a

Chinese buyer, drafted contracts and communicated with potential buyers in China over WeChat, a common messaging application in China. He continually emphasized to the group that he had connections to the oil industry in China. He intimated that he was related to the Chinese Minister of Energy and worked as the U.S. representative for a Chinese refinery.

By December 2019, Wang represented to the group over WhatsApp that he had identified a buyer. He told "Boss Tang," his Chinese buyer, that he would not get into trouble purchasing this sanctioned oil as long as he did not "come to the United States or have any association with Americans, it won't be much of a problem even if they find out." Upon receiving an acceptance letter from a purchaser, Wang circulated it to Mason, Shah, Thwaites, and Fuchs. He encouraged everyone to close the deal as soon as possible.

To launder the proceeds from the sale of the sanctioned Iranian oil to the Chinese buyer, the participants planned on requesting payment from the buyer via a Polish shell company, which would have no assets or operations, with the use of Swiss bank accounts. The defendants took steps to set up a Polish company and open Swiss bank accounts. Wang, along with other defendants, applied for an Antiguan passport to facilitate the use of the offshore bank accounts without any United States identification. In this way, they hoped to shelter the proceeds

of the oil sale from taxation by the United States.  Wang sought
to arrange for the Chinese buyers to pay the Polish shell
company for the purchase of Iranian oil and even booked a flight
to China to close the deal.

In January 2020, Shah reached out to Lane to discuss
the laundering of the money to be paid for the sanctioned
Iranian oil with mineral rights.  Lane agreed to launder $4
million in profit in connection with this scheme.  He would
receive a commission for facilitating this transaction. Lane
continued to participate and even purchased a bulk money counter
for approximately $4,000.  Again, he was advised he could
withdraw without consequence.

On February 10, 2020, Wang, Thwaites, Fuchs, and Hovan
traveled to Philadelphia to finalize the plan to purchase the
sanctioned Iranian oil and sell it to China.  In a room at a
hotel where they met with Mason, Shah, and other undercover FBI
agents, they signed falsified contracts to disguise their
profits from Iranian oil as consulting payments.  After these
four individuals reaffirmed their commitments to the scheme, FBI
agents entered the room and arrested them.

In the meantime, on the same day, Lane was meeting
with undercover agents for lunch at a restaurant in Dallas so
that they all could become acquainted before the undercover
agents were scheduled to fund the purchase of the Iranian oil by

delivering $4 million in cash to Stack Royalties that night. The conversation was relaxed and jovial. During the lunch, Lane required all the participants sign non-disclosure agreements. Upon leaving the meeting, Lane was arrested.

II

Under Rule 29, the court must "enter judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The court must review the evidence in the light most favorable to the Government to determine whether a rational jury could have found a defendant guilty beyond a reasonable doubt. See Wolfe, 245 F.3d at 261. All reasonable inferences are drawn in favor of the jury's verdict. A defendant carries a heavy burden when challenging the sufficiency of the evidence. See United States v. Lore, 430 F.3d 190, 203-04 (3d. Cir. 2005).

Defendants raised the defense of their entrapment in this sting operation. Both Lane and Wang seek judgment of acquittal on the ground that the Government failed to meet its burden that entrapment was absent. It is of course legitimate for the Government to engage in such an undercover operation if no entrapment occurred. United States v. Martino, 825 F.2d 754, 763 (3d Cir. 1987). Our Court of Appeals has explained:

> The affirmative defense of entrapment has
> two elements: (1) government inducement of
> the crime, and (2) lack of predisposition on

-8-

the part of the defendant to engage in the
criminal conduct.  If a defendant makes a
prima facie showing of both elements, the
burden shifts to the government to disprove
the entire defense by disproving one of the
elements of the defense beyond a reasonable
doubt.

United States v. Davis, 985 F.3d 298, 307 (3d Cir. 2021)

(citations omitted).  Both Wang and Lane satisfied the burden of

production to be entitled to a jury instruction on entrapment.

The court gave the following instruction to the jury:

A defendant may not be convicted of a crime
if he or she was entrapped by the Government
to do the acts charged.  The Government is
permitted to use undercover agents,
deception, or other means of providing
opportunities for an unwary criminally
minded person to commit a crime.

But the law does not permit the Government
to induce an unwary innocent person into
committing a criminal offense.  The defense
of entrapment includes two inquiries, and
you must make these inquiries about each
defendant separately.

First, did the Government induce the
defendant to commit the offense?  Second,
was the defendant predisposed, that is,
ready and willing to commit the offense
before he was first approached by the
Government?

It's the Government's burden to prove beyond
a reasonable doubt that one person was not
entrapped.  Thus, you may find the defendant
guilty of the offenses charged . . . only if
. . . you find that, in addition to proving
the elements of [each] offense, the
Government also proved beyond a reasonable
doubt either, (1) that the Government did
not induce the commission of the offense, or

-9-

(2) that the defendant was predisposed,
meaning that the defendant was ready and
willing to commit the offense before the
Government agents first approached him about
the crime.

. . .

If you find the Government proved beyond a
reasonable doubt that it did not induce the
defendant to commit the offense, then you
should find that there was no entrapment in
that defendant's case.

However, if you do have a reasonable doubt
about whether the Government proved that it
did not induce the defendant, then you must
decide whether the Government proved beyond
a reasonable doubt that the defendant was
predisposed - that is, that the defendant
was ready and willing to commit the offense
before the Government first approached him
about it.

. . .

In summary, the Government must prove beyond
a reasonable doubt that it did not induce
[defendant] to commit the offenses charged,
or that [defendant] was predisposed to
commit the offenses charged before he was
approached by the government.

The Government does not have to prove both.
The Government must only meet its burden as
to one of these elements.  If [the
Government] fails to meet that burden, you
should find [defendant] not guilty.

First, Wang and Lane claim that the Government failed

to carry its burden of proof as to the absence of inducement.

Mere solicitation or an offer to participate in criminal

activity by a government agent is insufficient to constitute

-10-

inducement.  United States v. Dennis, 826 F.3d 683, 690 (3d Cir. 2016).  Instead, the government actor must have engaged in conduct such as threats, coercive tactics, promises of reward, or harassment.  United States v. Wright, 921 F.2d 42, 45 (3d Cir. 1990).  The court instructed the jury on the meaning of inducement:

> Inducement means that the Government implanted the criminal design in the mind of the defendant.  The Government's actions that could amount to inducement include persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.
>
> The Government does not induce a person to commit an offense if the Government merely approaches that person, or solicits, requests, or suggests that he or she commit the offense, or affords an opportunity to facilitate – or facilitates to commit the crime.

Lane argues he was induced to commit these crimes. While he ultimately rejected the possibility of selling Iranian oil to his Panamanian contacts, he did not do so immediately. Rather, he took over a month to consider the option.  In January 2020, Shah approached Lane and asked if he would use mineral rights to launder money as Lane had originally suggested.  Lane readily agreed to sell $5 million in mineral rights to the front men for the Iranians in exchange for a $1 million official payment and an unrecorded $4 million cash payment.

-11-

Lane contends that he was induced because the undercover agents acting as the front men at the February 10, 2020 luncheon meeting in Dallas appeared to him that they might be members of a dangerous drug cartel. During the lunch, Alfredo Lopez, one of the undercover FBI agents, exhibited knowledge of Mexican drug cartels. He stated that despite the danger of drug trafficking, the Mexican government did not crack down on drug cartels because of the money that could be made. To another undercover agent, Lopez stated that he could provide protection from cartel violence while the two of them visited Mexico. According to Lane, this signaled to him that Lopez was connected to the cartel. Finally, this agent stated that MS-13, a gang active in Mexico and Texas, kills people on behalf of the Mexican cartel. Lane avers that these statements constituted threats of violence to coerce him to continue his participation.

A reasonable jury could find this conversation was insufficient to constitute inducement as Mason and the undercover FBI agents had regularly reminded Lane that he could exit the scheme. Lane is a sophisticated party who ran his own mineral rights company, had previously traded in oil, and participated willingly in the scheme out of a desire to make a significant profit. Moreover, the conversation with Lopez was recorded and Lane appeared relaxed, jovial, and eager to be involved, rather than hesitant, concerned, or in fear. Merely

-12-

affording Lane the opportunity to commit the offenses does not rise to the level of inducement.

Wang argues that the Government did not establish that he was not induced because, in his view, the evidence showed that Shah and Mason solicited Wang's participation. These confidential informants acknowledged that they kept Wang "warm" by continuing to discuss plans over WhatsApp and bringing new ideas to him. However, a reasonable jury could find that Wang was not induced. Wang is college-educated and claimed knowledge about the oil trade. In the July 31, 2019 call, he was relaxed and talked at length about his interest in brokering the oil sale and his business connections in China. He went so far as to say he "loved sanctions" and discussed how the increased risk of criminal prosecution could increase their profits. He made these representations throughout the course of the scheme. When Mason and Shah reminded him that he could cease any involvement, Wang reiterated that he had experience in dealing with sanctioned oil. Wang was interested and responded readily to these opportunities to commit the offenses. The Government carried its burden in showing that defendants were not induced.

Next, Wang and Lane maintain that the Government was unable to prove their predisposition to commit the offenses beyond a reasonable doubt. As our Court of Appeals has written:

> The government may prove predisposition by
> showing "(1) an existing course of criminal
> conduct similar to the crime for which the
> defendant is charged, (2) an already formed
> design on the part of the accused to commit
> the crime for which he is charged, or (3) a
> willingness to commit the crime for which he
> is charged as evidenced by the accused's
> ready response to the inducement."

Davis, 985 F.3d at 307 (quoting United States v. Lakhani, 480

F.3d 171, 179 (3d Cir. 2007)).  Other factors relevant to the

question of predisposition include whether defendant had any

prior criminal record, whether the Government initially

suggested the criminal activity, whether there was a profit

motive, whether the defendant demonstrated reluctance, and the

nature of the inducement.  United States v. Fedroff, 874 F.2d

178, 183 (3d Cir. 1989).  The court instructed the jury as

follows:

> [T]he Government must prove [] the
> defendants' inclination by establishing (a)
> an existing course of criminal conduct
> similar to the crime for which defendant is
> charged; (b) an already formed design on the
> part of the accused to commit the crime for
> which he's charged; or (c) a willingness to
> commit the crime for which he's charged as
> evidenced by the accused's ready response to
> the . . . inducement.
>
> In deciding this question, you should
> consider all the evidence, including any
> evidence about whether the Government
> initially suggested the criminal activity,
> whether the defendant was reluctant after
> being approached about the criminal
> activity, the nature of the Government's
> inducement or persuasion, whether the

defendant had already formed an intent or
design to commit the offense charged,
whether the defendant was engaged in an
existing course of criminal conduct similar
to the offenses charged, whether the
defendant was engaged in criminal activity
for profit, and evidence of the defendant's
character or reputation.

Lane, who had no criminal record, asserts that he was
not predisposed because at one point he rejected the offer to
engage in criminal conduct.  This is not what the evidence
demonstrates.  Though he did not broker a sale of Iranian oil to
his Panamanian contacts, Lane took over a month to reject the
opportunity and later readily participated.  Lane asserts that
the Government added additional pressure both by suggesting that
the money was coming from a dangerous criminal organization and
by increasing his potential profits.  Even if this is so, Lane
exhibited not just a willingness but an eagerness to commit the
crime.  He was forthcoming, relaxed, and participatory during
meetings.  He anticipated issues in the criminal scheme and
provided further suggestions as to how to further launder the
profits of the sale of sanctioned oil.  As the owner of a
mineral rights company with experience in brokering oil sales,
he was a sophisticated party to the transaction.  When
approached to launder money through Stack Royalties, he took
steps to effectuate this plan by buying a bulk money counter for

$4,000.  There is sufficient evidence for a jury to find that Lane was willing to commit these offenses.

Wang contends that the Government failed to prove that he was predisposed because it failed to establish he knew the proposed transaction to be illegal.  This argument fails.  Recordings of Wang's conversations with Mason, Shah and the other defendants introduced at trial show that Wang recognized the risks of trading in sanctioned oil and concluded that such risks were manageable.  He also discussed these risks with a potential Chinese purchaser and stated that a person would not be held criminally liable provided a non-citizen did not engage in this transaction in connection with an American entity.  While there was no direct evidence that Wang conceded this scheme was illegal for him as a citizen of China and lawful permanent resident of the United States, there is significant circumstantial evidence that he was aware of these risks.

There was also evidence he was willing to commit the offenses.  During the July 31, 2019 call with Mason, he expressed that he "loved" sanctions.  He regularly communicated with Mason, Shah, Thwaites, and Fuchs regarding his efforts to advance the scheme.  He solicited multiple Chinese purchasers, took steps to launder money through a Polish shell company set up by the group and obtain an Antiguan passport, and even booked a flight to China to consummate the deal.

-16-

The Government met its burden as to both Wang and Lane
in showing that the defendants were predisposed to participate
in this illegal conduct.  Accordingly, the motions for judgment
of acquittal of Wang and Lane will be denied.

III

Both Wang and Lane seek a new trial under Rule 33 of
the Federal Rules of Criminal Procedure, which permits the court
to grant a new trial "if the interest of justice so requires."
The standard of review under Rule 33 is different than under
Rule 29.  Here, the evidence is not evaluated in the light most
favorable to the Government.  Instead, a new trial may be
granted if in the view of the court the verdict is against the
weight of the evidence.  See United States v. Johnson, 302 F.3d
139, 150 (3d Cir. 2002).  The court must consider whether there
is "a serious danger that a miscarriage of justice has
occurred."  See United States v. Silveus, 542 F.3d 993, 1004-05
(3d Cir. 2008).  A new trial may also be granted on the ground
that the instructions provided to the jury were erroneous.
Under those circumstances, a new trial is warranted when the
instructions do not fairly or adequately present the issue
without confusing or misleading the jury.  See Donlin v. Philips
Lighting N. Am. Corp., 581 F.3d 73, 79 (3d Cir. 2009).

Lane contends that a new trial is appropriate because
the jury, in his view, did not understand how to apply

-17-

entrapment to the evidence presented and as a resort there was a "serious danger that a miscarriage of justice has occurred." Lane did not object to the entrapment instruction to the jury nor did he object when the instruction was reread to the jury. "We assume that jurors 'for the most part understand and faithfully follow [jury] instructions.'"  O'Brien v. Middle East Forum, 57 F.4th 110, 122 (3d Cir. 2023).  No miscarriage of justice has occurred.

Wang seeks a new trial because he maintains that he was prejudiced due to the court's failure to instruct the jury on mistake of law, that is that a defendant may be acquitted if he had an honest misunderstanding about whether his actions were illegal.  A defendant is entitled to a proposed instruction if:

> (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of the defendant's theory would deny him a fair trial.

United States v. Friedman, 658 F.3d 342, 352-53 (3d Cir. 2011). The Government asserts that Wang has not satisfied the second prong.

Wang maintains that due to his misunderstanding of the law, the Government could not prove beyond a reasonable doubt that Wang acted knowingly and willfully.  The court instructed the jury as to acting knowingly and willfully.  It stated:

-18-

A person acts "knowingly" if that person
acts voluntarily and intentionally and not
because of mistake or accident or other
innocent reason.  This means that the
Government must prove beyond a reasonable
doubt that the defendant was conscious and
aware of the nature of his actions and of
the surrounding facts and circumstances, as
specified in the definition of the offense
charged.

In deciding whether the defendant acted
"knowingly," you may consider evidence about
what the defendant said, what the defendant
did and failed to do, how the defendant
acted, and all the other facts and
circumstances shown by the evidence that may
prove what was in the defendant's mind at
that time.

A person acts "willfully" if that person
knew his conduct was unlawful and intended
to do something that the law forbids.  That
is, to find that the defendant acted
"willfully," you must find that the evidence
proved beyond a reasonable doubt that the
defendant acted with a purpose to disobey or
disregard the law.  "Willfully" does not,
however, require proof that the defendant
had any evil motive or bad purpose other
than the purpose to disobey or disregard the
law.

The defendant need not be aware of the
specific law or regulation that his conduct
would violate.  However, the Government must
prove the defendant had general knowledge of
the law which forbade his actions and that
he acted with the specific intent to
circumvent that law.

Wang objected to this instruction at trial and now argues that

the court should have instructed the jury that to find him

guilty it must have found he acted "willfully . . . that the

defendant knew his conduct was unlawful and had a purpose to disobey or disregard the law."

Wang posits that the evidence establishes that he had an honest misunderstanding as to the legality of his conduct. Though he initially stated that he was knowledgeable about oil sales in China, he contends that, beyond his representations, there was no evidence he was telling the truth.

The court's instruction was proper on knowledge and willfulness.  A guilty verdict was not against the weight of the evidence.  Wang understood the risk of sanctions.  Upon hearing about the opportunity to broker a sale of sanctioned oil, he positively discussed the impact that the high risk of sanctions would have on the bottom line.  Participants, including an apparent Chinese buyer, identified these risks to him throughout the conspiracy.  Wang's response to the Chinese buyer demonstrated that he understood that non-citizens of the United States could still be punished for violating United States sanctions if the transaction had a connection to the United States.

The court did not err in failing to provide Wang's requested jury instruction on the state of mind required.  The verdict was not against the weight of the evidence, and thus the motion of Wang for new trial will be denied.

IV

Finally, Wang moves the court to arrest judgment under Rule 34 on the ground that the court did not have jurisdiction to charge Wang with conspiracy to violate IEEPA or attempt to violate IEEPA.  A motion under Rule 34 will be granted if "the court does not have jurisdiction of the charged offense."  Fed. R. Crim. P. 34(a).[3]  To determine if such an error exists, the court does not consider the evidence introduced at trial, but rather must look to the indictment, the verdict, and the sentence.  <u>United States v. Sisson</u>, 399 U.S. 267, 281 n.10 (1970).

Wang argues that the court should arrest judgment because IEEPA constitutes an unconstitutional delegation of authority by Congress to the President.  IEEPA was enacted in 1977 and authorizes the President to exercise

> Any authority granted to the President [by the statute] to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

---

3.   Though prior to 2014, a motion may be made under Rule 34 for a defective indictment, amendments to the Federal Rules of Criminal Procedure in 2014 limited Rule 34 to jurisdictional challenges.  <u>United States v. D'Ambrosio</u>, Crim. A. No. 15-3, 2019 WL 3776510, at *9 (M.D. Pa. Aug. 12, 2019).  A defective indictment is not a jurisdictional concern.  <u>United States v. Cotton</u>, 535 U.S. 625, 629-31 (2002).

50 U.S.C. § 1701(a).  The President may issue regulations in response to a national emergency to investigate or block international economic transactions or confiscate property where there is a person or entity involved in the transaction over which the United States has jurisdiction.  50 U.S.C. § 1702(a). Congress may terminate a national emergency by concurrent resolution, and when it does so, the President may no longer exercise the aforementioned powers.  Id. at § 1706(b).  If a person willfully commits or willfully attempts to commit an action made unlawful under IEEPA regulations, that person may be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both.  Id. at § 1705(c).

       The court instructed the jury:

> IEEPA empowers the federal Government to issue and enforce economic sanctions in the interest of national security.  As I will explain in more detail in a moment, this case involves regulations related to doing business with Iran, which are among the regulations incorporated by reference into IEEPA.
>
> . . .
>
> A regulation under the IEEPA prohibits a United States person from engaging or attempting to engage "in any transaction or dealing in or related to goods or services of Iranian origin or owned or controlled by the Government of Iran."  The term transaction or dealing includes the purchasing, selling, transporting,

> financing, facilitating, or brokering of any
> oil of Iranian origin.
>
> The regulations under the IEEPA also
> prohibit any transaction with Iran by any
> Unites States person who "evades or avoids,
> has the purpose of evading or avoiding,
> causes a violation of, or attempts to
> violate any of the prohibitions."

In 1987, the President simply limited the importation of Iranian goods to the United States.  Exec. Order No. 12613, 52 Fed. Reg. 41940 (Oct. 29, 1987).  Later executive orders declared Iran an "unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and hereby declare[d] a national emergency to deal with that threat." Exec. Order No. 12957, 60 Fed. Reg. 14615, 14615 (Mar. 15, 1995).  In 2018, the President banned individuals from "knowingly engag[ing] in a significant transaction for the purchase, acquisition, sale, transport, or marketing of petroleum or petroleum products from Iran."  Exec. Order No. 13846, 83 Fed. Reg. 38939, 38941 (Aug. 7, 2018).  United States persons may only participate in sanctioned transactions if they obtain a license to do so.

In United States v. Amirnazmi, our Court of Appeals considered the constitutionality of IEEPA as applied to a defendant convicted for contracting with Iranian entities to facilitate the construction of chemical plants there.  645 F.3d 564, 567-69, 571 (3d Cir. 2011).  The court held that IEEPA, as

amended, was constitutional because it "'meaningfully constrains' the President's discretion." Id. at 576 (quoting Touby v. United States, 500 U.S. 160, 166 (1991)). Congress placed sufficient procedural restrictions on the President's exercise of his or her powers in a national emergency, and thereby permitted the President to be flexible during a national emergency while still limiting his or her discretion. Id. at 577.

Wang posits both that IEEPA is impermissibly vague, as it does not define a national emergency, as well as that Congress has insufficient oversight over the President's authority under the statute. However, these arguments are without merit. Amirnazmi controls.

The motion of Wang to arrest his judgment on the basis of IEEPA's unconstitutionality will be denied.